IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN BERES,<br><br>    Plaintiff,<br><br>  v.<br><br>MATTHEW KATES, Secretary,<br>California Department of<br>Corrections, et al.,<br><br>    Defendants.<br>_____ | No. C 08-4683 MMC (PR)<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT;**<br>**DISMISSING SUPPLEMENTAL STATE**<br>**LAW CLAIMS**<br><br>**(Docket No. 16)** |

    On October 9, 2008, plaintiff, a California prisoner incarcerated at the Correctional Training Facility II ("CTF") at Soledad and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983, claiming deliberate indifference to his serious medical needs. Thereafter, the Court found the complaint, when liberally construed, stated a claim for relief against four defendants.

    Now before the Court is defendants' motion for summary judgment. Plaintiff has opposed the motion and defendants have filed a reply.

**BACKGROUND**[1]

    The events underlying plaintiff's claims occurred while plaintiff was incarcerated at

---

[1] The following facts are undisputed and are derived from plaintiff's verified complaint and the parties' exhibits. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (holding verified complaint may be used as opposing affidavit under Rule 56 if based on personal knowledge and sets forth specific facts admissible in evidence).

1 CTF in 2007 and 2008. Specifically, plaintiff claims he received constitutionally inadequate
2 medical care for his chronic coughing and breathing problems from defendants
3 Narayanaswamy Dayalan, M.D. ("Dr. Dayalan"), a staff physician at CTF; Joseph Churdy,
4 M.D. ("Dr. Churdy"), the Chief Medical Officer at CTF; Ben Curry ("Warden Curry"), the
5 Warden at CTF; and Matthew Kates ("Director Kates"), the Director of the California
6 Department of Corrections and Rehabilitation. The undisputed facts concerning plaintiff's
7 claims are as follows.

8 On July 2, 2007,[2] plaintiff was brought to the CTF medical clinic for complaints of
9 breathing problems and a cough. (Mot. for Summ. J. Ex. B.)[3] Upon examination, plaintiff's
10 vital signs were found to be normal, both lungs were clear, there was no evidence of labored
11 or difficult breathing, and his oxygen saturation levels (the amount of oxygen in the blood)
12 were normal. (Id.) Plaintiff was prescribed Doxycycline and Robitussin (an over the counter
13 cough medicine) for his cough, and Advair (a prophylactic for breathing problems associated
14 with asthma and chronic obstructive pulmonary disease ("COPD")).[4] (Ex. C.)

15 Later that month, on July 26, plaintiff was again evaluated by a staff physician, who
16 referred plaintiff to a pulmonologist and for a pulmonary function test. (Ex. D.)
17 Additionally, an Albuterol inhaler (a bronchodilator) was prescribed. (Id.)

18 Approximately one month later, on August 23, plaintiff was seen by defendant Dr.
19 Dayalan for continued complaints of breathing problems. Dr. Dayalan changed plaintiff's
20 Albuterol prescription to one for an Azmacort inhaler (used to treat breathing problems
21 associated with asthma and other lung diseases), and renewed plaintiff's Robitussin
22 prescription. (Ex. E.)

23
---

24 [2]All dates referenced hereinafter are in 2007.

25 [3]Unless otherwise noted, all references to exhibits herein are to those submitted by defendants in support of the motion for summary judgment.`
26

27 [4]In the course of plaintiff's numerous appointments at the CTF medical clinic discussed herein, plaintiff was seen by several staff physicians and other medical staff. For ease of reference, the Court, in discussing those appointments, identifies by name only Dr.
28 Dayalan and Dr. Churdy, the two CTF physicians named as defendants to the instant action.

2

1   Approximately three weeks later, on September 12, plaintiff was seen via a
2 telemedicine consultation by a pulmonologist with the Centennial Medical Group, Mary
3 Magalong, M.D. ("Dr. Magalong"). Dr. Magalong questioned plaintiff about his symptoms
4 while a nurse at CTF examined plaintiff. (Ex. F.) In her report of the consultation, Dr.
5 Magalong summarized plaintiff's history of his complaint as follows:

> 50 [year-old] male prisoner from CTF referred for br[e]athing difficulties. Patient denies history of asthma. He claims that since May 2007 he has been having frequent attacks of wheezing, shortness of breath, cough productive of yellow phlegm, chest congestion and nasal congestion. He has also been having frequent post-nasal drip. He has been on different antibiotics, and nothing seem[s] to work except for levaquin. He has been on Advair which was subsequently changed to Albuterol and [A]zmacort. The patient however admits that he does not use these inhalers because he does not believe that he has asthma, and the medicines only give him headaches.

11 (Ex. F at 1.)
12   Additionally, Dr. Magalong noted that plaintiff had smoked two to three packs of
13 cigarettes per day for the past 15 to 20 years, and also had smoked cocaine. (Ex. F at 2.)
14   Based on the physical examination performed by the CTF nurse during the
15 consultation, Dr. Magalong further reported that plaintiff did not have swollen lymph nodes,
16 and had mild expiratory wheezing. (Ex. F at 2.) In order to obtain a diagnosis of plaintiff's
17 ailment, Dr. Magalong recommended two CT scans (one of plaintiff's chest and one of his
18 sinuses), laboratory tests, cultures and pulmonary function tests. (Id.) She also prescribed
19 Atrovent, another inhaler-administered medication. (Id.)
20   The following day, September 13, plaintiff returned to the CTF clinic, where he was
21 seen by Dr. Dayalan. Dr. Dayalan ordered all of the tests and medications recommended by
22 Dr. Magalong. (Ex. G.)
23   Four days later, plaintiff's sputum and blood samples were taken, and the results were
24 reported within a week. (Ex. H.) The reports showed plaintiff's MCV (red blood cell size)
25 was slightly elevated, his white blood cell percentage was slightly below normal, and all
26 other levels, including lung bacteria levels, were within normal limits. (Id. at 1-2.)
27   Approximately one month later, on October 17, plaintiff was seen at the CTF clinic
28 for further complaints of coughing and difficulty breathing and was scheduled for an urgent

appointment with a physician. (Ex. I at 1.) Plaintiff was seen later that day by the on-duty physician, who noted no respiratory distress and that plaintiff's vital signs were within normal limits. Plaintiff was assessed as suffering from probable bronchitis, asthma, or upper respiratory infection; a chest x-ray was ordered, and plaintiff was prescribed Robitussin for his cough, Keflex for bronchitis, Actifed for congestion, and nasal spray. (Ex. I at 4, 5.)

The chest x-ray was completed that same date, and the radiologist's findings were reported as follows:

> The cardiomediastinal silhouette is within normal limits for size and configuration. The lung fields are clear, with no evidence for consolidation, mass lesion, vascular congestion, or pleural effusion. The pleural margins and costophrenic sulfi are sharply defined. The diaphragm, aorta, thoracic cage, and tracheal air shadow show no significant abnormality.
>
> Conclusion: Normal chest radiographic findings.

(Ex. J.)

Approximately one week later, on October 25, plaintiff was seen at the CTF clinic for a follow-up appointment, and his Robitussin and Actifed prescriptions were renewed. (Ex. K at 1, 2.)

On November 13, 2007, plaintiff was again seen at the CTF clinic for complaints of coughing and breathing difficulty. At the examination, it was noted that plaintiff's lungs were clear and his other vital signs were normal. Plaintiff was assessed as having "dyspnea [shortness of breath] of ? etiology . . ." Copies of plaintiff's chest x-rays and pulmonologist's report were ordered, and plaintiff was referred for a CT scan of his sinuses. (Ex. K at **7.**)

Approximately one week later, on November 21, plaintiff was seen by Dr. Dayalan for complaints of shortness of breath and difficulty urinating. Dr. Dayalan noted that plaintiff had been seen by a pulmonologist and received a chest x-ray, but that the pulmonologist's report was not in plaintiff's file. Dr. Dayalan assessed plaintiff as having bronchitis; he referred plaintiff for a follow-up consultation with the pulmonologist, ordered x-rays, and renewed plaintiff's Actifed and Robitussin prescriptions. (Ex. K at 8, 9.)

4

Two weeks later, on December 5, plaintiff received, pursuant to Dr. Dayalan's order, a CT scan of his thorax to evaluate him for possible bronchiectasis (damage to the airways). As set forth in the radiologist's report, no lung or bronchial abnormalities were found. (Ex. L.) That same date, defendant Dr. Churdy authorized a pulmonary function test at an outside hospital. (Ex. N.)

Plaintiff had the pulmonary function test five days later; the test report concluded that plaintiff's lung volume was normal, and that he had no airway obstruction. (Ex. O.)

Ten days later, on December 20, plaintiff was seen by Dr. Dayalan for complaints of difficulty breathing. Dr. Dayalan reviewed plaintiff's file and confirmed the radiographic tests had been performed and the pulmonary function test given; Dr. Dayalan examined plaintiff, noted that he was being seen by a pulmonologist, renewed his prescriptions for Actifed, Robitussin and an inhaler, and ordered that he be seen for follow-up in two to three weeks. (Ex. P at 1-3.)

On December 31, plaintiff submitted a health care request, complaining that he still was not well and that Dr. Dayalan was refusing to give plaintiff his medication. Plaintiff was scheduled for a January 14, 2008 appointment with a physician.[5] (Ex. P at 6.)

On January 3, 14 and 23, plaintiff came to the CTF clinic for follow-up appointments and to have his prescriptions renewed. (Ex. P at 7-10.)

On February 13, plaintiff submitted a health care request, complaining that he was coughing "a lot," and that he felt his lungs were "not right." (Ex. P at 11.) He asked for medication and to see a specialist; plaintiff was scheduled for a February 26 appointment with CTF medical staff. (Id.) At the appointment, plaintiff was examined and his lungs were found to be clear and his vital signs normal. (Ex. P at 12.) Additionally, the results of plaintiff's medical tests were reviewed and discussed with him. In particular, in response to plaintiff's insistence that he was suffering from a cocci infection (an infection of the lungs caused by a fungus), it was explained to plaintiff, as it had been at his last medical visit, that

---

[5] All dates referenced hereinafter are in 2008.

5

he had tested negative for cocci.  (Ex. P at 12-13.)

Three days later, a CT scan of plaintiff's sinuses was performed pursuant to Dr. Dayalan's order.  The radiologist reported that plaintiff's sinuses were normal.  (Ex. M.)

On March 4, plaintiff submitted a health care request for further tests for lung fungus and viruses.  (Ex. P at 14.)  Two days later, plaintiff was seen by a CTF physician, who examined plaintiff and assessed him as having allergic rhinitis and chronic bronchitis.  Although plaintiff asked to be treated with antiviral medication, the doctor explained that there currently was no need for such medication as plaintiff did not have a viral infection.  (Ex. P at 15.)

Ten days later, on March 14, plaintiff was seen by Dr. Magalong for a telemedicine pulmonary follow-up visit.  (Ex. Q.)  Dr. Magalong discussed the results of plaintiff's x-rays and other tests, explaining that his chest x-rays and sinus CT scan were normal, as was his pulmonary function test.  Plaintiff requested a lung biopsy; Dr. Magalong explained that, given the normal CT scans and pulmonary function test, there was nothing to biopsy.  Plaintiff complained that his coughing and phlegm production increased at night upon lying down, and that he had a sore throat and pain when swallowing.  Dr. Magalong assessed plaintiff's symptoms as possibly being caused by GERD (gastroesophageal reflux disease).  She also assessed plaintiff as not having COPD, chronic bronchitis, or bronchiectasis.  (Ex. Q at 1-2.)  Dr. Magalong's plan was to recommend plaintiff for referral to a gastroenterologist for tests to assess him for GERD, to discontinue his use of inhalers, and to prescribe medication for acid indigestion, an expectorant, and an anti-fungal mouthwash for plaintiff's sore throat.  (Id. at 2.)

On March 24, plaintiff submitted a health care request, complaining about his lung problems and requesting new medication.  (Ex. R at 1.)  Three days later, plaintiff was seen by a nurse practitioner, at which time Dr. Magalong's assessment of plaintiff's symptoms was explained to plaintiff and the medications recommended by Dr. Magalong were prescribed.  (Ex. R at 2.)

Thereafter, plaintiff submitted health care requests and sought medical attention at the

6

1 CTF clinic on eight separate occasions, specifically, April 7, 9, 21, 25 and 27, and May 1,
2 6and 13, all for continued complaints of breathing difficulty, coughing, and nasal fungus.  On
3 each occasion, he was seen by a nurse, who checked his symptoms and informed him that he
4 was not in need of urgent care and would be scheduled for a routine medical visit.  (Ex. S at
5 1-8.)

6 On May 14, plaintiff was seen by Dr. Dayalan, who examined plaintiff and
7 determined that, despite plaintiff's insistence on being prescribed an anti-fungal medication,
8 plaintiff did not have a nasal fungus and did not require medication for such condition.  (Ex.
9 S at 9.)

10 On May 31, plaintiff was brought to the CTF clinic on a gurney, complaining of
11 shortness of breath.  He was examined and found to have no breathing difficulty, his lungs
12 were clear, and his vital signs were normal.  (Ex. S at 10-11.)

13 On June 8 and 16, plaintiff submitted health care requests, asking to have a culture
14 done to test for an upper respiratory tract infection.  Plaintiff was examined, his medications
15 were renewed, and he was referred to be seen by a physician on a non-urgent basis.  (Ex. S at
16 12,13.)

17 On July 3, plaintiff was seen by Dr. Dayalan for complaints of chronic cough and
18 stomach pains.  Dr. Dayalan reviewed plaintiff's medical file and examined plaintiff.  He
19 found plaintiff's lungs were clear.  He recommended a follow-up for plaintiff to be referred
20 for an upper endoscopy for possible gastrointestinal problems.  (Ex. S at 14.)  Eight days
21 later, plaintiff had an EGD (esophagogastroduodenoscopy).  (Ex. S at 17.)

22 Plaintiff was seen again at the CTF medical clinic on July 15 and 22, complaining of
23 stomach pains and chronic lung and throat inflammation.  He was examined by medical staff
24 and found not to be in need of urgent care; he was scheduled to see a physician on a non-
25 urgent basis.  (Ex. S at 15, 16.)

26 On July 29, plaintiff was seen by a CTF physician for a follow-up appointment.  The
27 medical notes from the visit show the EGD revealed plaintiff was infected with H. pylori (a
28 bacterial infection that causes chronic gastritis), and that he was prescribed medication to

7

1  treat the condition and scheduled for a follow-up EGD in two months.  (Ex. S at 17.)

2  Less than a week later, another round of chest x-rays was ordered for plaintiff based
3  on his continued complaints of coughing and difficulty breathing.  (Ex. S at 18.)  The x-rays
4  were completed within a month, on September 4; the findings were normal and showed no
5  change since plaintiff's October 17, 2007 chest x-rays.  (Ex. T.)

6  A little more than three months later, on December 17, plaintiff had another series of
7  chest x-rays.  His lungs were found to be clear, and the radiologist concluded there was "[n]o
8  evidence for acute cardiopulmonary disease, or significant interval change from the prior
9  study of 09/04/2008."  (Ex. U.)

10  Approximately eight months later, on August 7, 2009, plaintiff had two more chest x-
11  rays. The report concluded: "Normal chest radiographic findings.  Unchanged from prior
12  exam."  (Ex. V.)

## DISCUSSION

A. <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>id.</u>

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

8

party"). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.  Analysis

In his complaint, plaintiff claims defendants acted with deliberate indifference to his serious medical needs by failing to properly treat him for his chronic cough, shortness of breath and other symptoms he maintains are associated with a lung condition that has not been properly diagnosed.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to

9

1 abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The prison official must not only "be
2 aware of facts from which the inference could be drawn that a substantial risk of serious
3 harm exists," but "must also draw the inference." Id. Consequently, in order for deliberate
4 indifference to be established, there must exist both a purposeful act or failure to act on the
5 part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

6 A difference of opinion between a prisoner-patient and prison medical authorities
7 regarding treatment does not amount to deliberate indifference. Franklin v. Oregon, 662 F.2d
8 1337, 1344 (9th Cir. 1981). In order to prevail on his claim, the prisoner must establish that
9 the course of treatment doctors chose was "medically unacceptable under the circumstances"
10 and that they chose this course in "conscious disregard of an excessive risk to plaintiff's
11 health." See Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004).

12     1.    Dr. Dayalan

13 Plaintiff claims Dr. Dayalan acted with deliberate indifference to plaintiff's serious
14 medical needs by failing to properly diagnose and treat plaintiff's lung condition. The
15 undisputed evidence demonstrates, however, that Dr. Dayalan did not disregard plaintiff's
16 medical needs; rather, he provided plaintiff with a considerable amount of medically
17 acceptable care.

18 The record developed herein shows plaintiff was seen on six occasions by Dr. Dayalan
19 between July 2007, when plaintiff first came to the CTF medical clinic for his complaints of
20 coughing and difficulty breathing, and October 2008, when plaintiff filed the instant
21 complaint. Additionally, the undisputed evidence shows that at each visit Dr. Dayalan took
22 note of plaintiff's specific medical complaints, examined plaintiff, reviewed plaintiff's
23 medical files, assessed plaintiff's condition and took action based on such assessment.
24 Specifically, the undisputed evidence shows the following.

25 At plaintiff's first visit with Dr. Dayalan, in August 2007, Dr. Dayalan, knowing that
26 plaintiff had already been prescribed an inhaler and had a referral to see a pulmonologist,
27 responded to plaintiff's complaints of continued coughing and difficulty in breathing by
28 switching plaintiff to a different inhaler and renewing his cough medicine prescription. (Ex.

10

E.)

A month later, at plaintiff's second visit with Dr. Dayalan, in September 2007, Dr. Dayalan reviewed the report of Dr. Magalong, the pulmonologist with whom plaintiff had consulted the previous day, and ordered all of the procedures and medications recommended by Dr. Magalong, which included two CT scans (one of plaintiff's chest and one of his sinuses), laboratory tests, cultures, pulmonary function tests, and a different inhaler-administered medication. (Ex. G.)

Dr. Dayalan saw plaintiff for the third time in November 2007, after plaintiff had received chest x-rays that showed clear lungs and normal findings. Based on an examination of plaintiff, a review of plaintiff's medical file, and plaintiff's complaints of shortness of breath and difficulty urinating, Dr. Dayalan assessed plaintiff as having bronchitis; he referred plaintiff for a follow-up consultation with the pulmonologist, ordered CT scans to evaluate plaintiff for possible bronchiectasis (damage to the airways) and sinus problems, and renewed plaintiff's Actifed and Robitussin prescriptions. (Ex. K at 8, 9.) A CT scan of plaintiff's thorax was performed within two weeks, and revealed no lung or bronchial abnormalities. (Ex. L.)

A month later, in December 2007, plaintiff was seen a fourth time by Dr. Dayalan, for complaints of difficulty breathing. Dr. Dayalan reviewed plaintiff's file, confirmed that plaintiff had been x-rayed and given the pulmonary function tests, examined plaintiff, noted plaintiff was going to be seen by the pulmonologist, renewed his prescriptions for Actifed, Robitussin and an inhaler, and ordered that he be seen for follow-up in two to three weeks. (Ex. P at 1-3.)

Between January and mid-May 2008, plaintiff was seen and evaluated by CTF medical staff other than Dr. Dayalan on fourteen occasions, in each instance for his coughing and breathing complaints; additionally, during the same period, he had a second consultation with the pulmonologist, Dr. Magalong, and sinus scans were performed and showed no abnormalities. No definitive conclusion about the source of plaintiff's problems was reached by any medical professional during that time, although there was agreement that the medical

11

1 tests that had been performed conclusively showed plaintiff did not have a nasal fungal
2 infection, sinus problems, or a bacterial lung infection.  Nevertheless, when plaintiff saw Dr.
3 Dayalan for the fifth time, in mid-May 2008, plaintiff insisted on being prescribed an anti-
4 fungal medication for his nose.  Dr. Dayalan, after examining plaintiff and reviewing his
5 medical file, determined plaintiff did not have a nasal fungus and did not require such
6 medication.  (Ex. S at 9.)

7 The sixth time plaintiff saw Dr. Dayalan was in July 2008, for complaints of chronic
8 cough and stomach pains.  Dr. Dayalan examined plaintiff and found plaintiff's lungs were
9 clear.  He also reviewed plaintiff's medical file, which included Dr. Magalong's report from
10 her second consultation with plaintiff, in which Dr. Magalong noted plaintiff might be
11 suffering from GERD.  Dr. Dayalan recommended plaintiff be referred for an upper
12 endoscopy for possible gastrointestinal problems.  Eight days later, plaintiff had an EGD; the
13 results revealed plaintiff was infected with H. pylori, a bacterial infection that causes chronic
14 gastritis.  (Ex. S at 14, 17.)

15 Based on the above, the Court finds that although plaintiff is of the opinion that Dr.
16 Dayalan failed to properly diagnose and treat him for his continuing complaints of coughing
17 and breathing difficulties, there is no evidence in the record to suggest Dr. Dayalan's course
18 of treatment was, in any manner, medically unacceptable under the circumstances, or that he
19 chose such course of treatment in conscious disregard of an excessive risk to plaintiff's
20 health.  See Toguchi, 391 F.3d at 1058-60.  Consequently, there is no triable issue of fact
21 with respect to plaintiff's claim under the Eighth Amendment that Dr. Dayalan was
22 deliberately indifferent to plaintiff's serious medical needs, and, accordingly, said defendant
23 is entitled to summary judgment on plaintiff's claims.

24       2.     <u>Dr. Churdy</u>

25 In his complaint, plaintiff claims Dr. Churdy, the Chief Medical Officer at CTF, is
26 liable for plaintiff's alleged inadequate medical care "due to direct and personal
27 involvement."  (Compl. at 3:17-19.)  Aside from this conclusory allegation, however, the
28 only evidence submitted with respect to Dr. Churdy's involvement in plaintiff's care is a

12

signed authorization by Dr. Churdy, dated December 5, 2007, for plaintiff to have a pulmonary function test at an outside hospital.  (Ex. N.)  Such evidence fails to provide any basis for plaintiff's claim that Dr. Churdy personally acted with deliberate indifference to plaintiff's serious medical needs.

Further, to the extent plaintiff maintains Dr. Churdy is liable in his supervisory capacity, such claim fails as well.  Supervisory liability may be imposed against a supervisory official in his individual capacity only "for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Preschooler II v. Davis, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal quotation and citation omitted).  Consequently, a supervisor may be held liable under 42 U.S.C. § 1983 only upon a showing of personal involvement in a constitutional deprivation, or a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc) (citation omitted); see Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding supervisor ordinarily "is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them").

Under no circumstances is there respondeat superior liability under 42 U.S.C. § 1983; put another way, there is no liability under § 1983 solely because one is generally responsible for the actions or omissions of another.  See Taylor, 880 F.2d at 1045.  "In a § 1983 or a Bivens action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer; [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Based on the above, the Court concludes plaintiff has failed to raise a triable issue on his claim that Dr. Churdy either was personally involved in plaintiff's alleged inadequate care, or that he directed, or knew of and wrongfully failed to prevent, such alleged inadequate

care. Accordingly, summary judgment will be granted in favor of Dr. Churdy.

### 3. Warden Curry and Director Kates

Plaintiff claims CTF Warden Curry and CDCR Director Kates acted with deliberate indifference to plaintiff's serious medical needs in failing to provide the medical care requested by plaintiff by way of the inmate appeals process, specifically, examination by a specialist and prescription of appropriate medications. In support of his claim, plaintiff has submitted the administrative appeals he filed pertaining to his medical care and the responses thereto. (See Compl. Exs. Inmate Appeal Form & Director's Level Appeal Decision ("Director's Decision").) Warden Curry responded to plaintiff's second level appeal; thereafter, plaintiff's third, i.e., Director's level, appeal was reviewed by an appeals examiner and then denied on behalf of Director Kates by N. Grannis ("Grannis"), Chief of the Inmate Appeals Branch. (See id.)

In the Director's Decision, Grannis summarized the responses to plaintiff's prior appeals as follows:

> The [Director's level] reviewer found that a comprehensive and thorough review of the appellant's appeal was conducted. The First Level of Review noted that the appellant was examined by his primary care provider (PCP) who found no medical evidence that the appellant suffers from pulmonary problems. The PCP noted that the appellant was prescribed cough medicine, antihistamines, and pain medication for his symptoms and has a pulmonary appointment scheduled via telemedicine. The PCP noted that follow up examination will be scheduled after the appellant's consult. The Second Level of Review (SLR) noted that the appellant received the pulmonary consult and that the results from the computerized tomography and fitness tests were normal. The appellant was diagnosed with excessive cough/sputum production due to acid reflux. The SLR found that the appellant's PCP is monitoring his condition and has a treatment plan. The SLR partially granted the appeal.

(Director's Decision at 1.)

Based on such facts, Grannis denied plaintiff's third level appeal, concluding:

> The DLR [Director's Level of Review] finds appellant is not being denied medical treatment for his condition as he has been examined by a specialist, a diagnosis was rendered, his PCP has prescribed the appropriate medication, and he is scheduled for follow up care. The DLR finds that the appellant's medical concerns are being adequately addressed by the institution and the appellant should discuss any future medical concerns with his PCP.

(Director's Decision at 1.)

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Here, the undisputed evidence demonstrates that Warden Curry and Director Kates reasonably responded to plaintiff's medical requests by ensuring that thorough investigations of plaintiff's condition and care were conducted at the second and third levels of review and, based on the facts revealed by such investigations, reasonably determined plaintiff did not require other care in addition to, or instead of, that which he was receiving. As the evidence does not raise a triable issue as to plaintiff's claims that Warden Curry and Director Kates acted with deliberate indifference to plaintiff's serious medical needs, summary judgment will be granted in favor of each such defendant.

C.  Supplemental State Law Claims

In addition to the above-discussed federal constitutional claims, plaintiff brings supplemental state law claims alleging the violation of his right to adequate medical care while imprisoned. A federal court has supplemental jurisdiction over claims "that are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). A district court, however, may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); see Ove v. Gwinn, 264 F.3d 817, 826 (9th Cir. 2001) (holding court, under § 1367(c)(3), may decline to exercise supplemental jurisdiction over related state law claims once it has dismissed all claims over which it has original jurisdiction); see also Acri v. Varian Associates, Inc., 114 F.3d 999, 1000 (9th Cir. 1997) (holding district court correctly exercises discretionary authority to dismiss state law claims when associated federal claims dismissed before trial).

As the Court has granted summary judgment in favor of defendants as to all of plaintiff's federal constitutional claims, plaintiff's supplemental state law claims will be dismissed without prejudice to plaintiff's refiling such claims in state court in accordance

15

with the statutory tolling provision set forth at 28 U.S.C. § 1367(d). See id. ("The period of limitations for any supplemental [state law] claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Summary judgment is hereby GRANTED in favor of all defendants.

2. Plaintiff's supplemental state law claims alleging inadequate medical care are hereby DISMISSED without prejudice to plaintiff's raising those claims in state court.

This order terminates Docket No. 16.

IT IS SO ORDERED.

DATED: March 15, 2011

MAXINE M. CHESNEY
United States District Judge

16